**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| SUSAN M. SIMPSON, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case number 1:07cv0137 SNLJ |
| | ) | TCM |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
|     Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Susan M.

Simpson ("Plaintiff") supplemental security income benefits ("SSI") under Title XVI of the

Social Security Act ("the Act"), 42 U.S.C. § 1381-1383b.  Plaintiff has filed a brief in support

of her complaint; the Commissioner has filed a brief in support of his answer.  The case was

referred to the undersigned United States Magistrate Judge for a review and recommended

disposition pursuant to 28 U.S.C. § 636(b).

**Procedural History**

Plaintiff applied for SSI in August 2005, alleging she was disabled as of June 30, 1984,

as a result of a hormone imbalance, irregular menstrual periods, and problems with her right

eye, nerves, and back.  (R.[1] at 61-66.)  Her application was denied initially and after a hearing

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

held in November 2006 before Administrative Law Judge ("ALJ") Julian Cosentino. (Id. at 7-17, 45-50, 275-99.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 3-5)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and a vocational expert ("VE"), Jeffrey F. Magrowski, Ph.D., testified at the administrative hearing.

Plaintiff testified that she was born on July 6, 1962, and was then 44 years old. (Id. at 278.) She completed one semester of tenth grade.[2] (Id.) She is 6 feet tall, weighs 277 pounds, and is right-handed. (Id. at 278-79.) When filing for SSI, she weighed 343 pounds, but had lost weight because her doctors were afraid she would develop diabetes. (Id. at 290.) Plaintiff lives by herself in the home she lived in with her parents, which are both deceased. (Id. at 286-87.)

She has held three jobs, including working for one day in September 2004 for a nursing home, working for two months in 2004 for a bakery, and working for one day at a restaurant. (Id. at 279.) The jobs at the nursing home and restaurant were as a dishwasher and required that she stand all day; she could not do this and lost the jobs. (Id. at 280, 281.) The job at the bakery allowed her to sit down. (Id. at 280.) In this job, she alternated working as a baker and as a cashier. (Id.) She was fired from this job because the bakery was not making enough money. (Id.)

---

[2]Her school records include grades for the second semester. (R. at 268.)

Asked to describe her medical problems, Plaintiff reported that she has had back pain since falling off a horse when she was 23 years old. (Id. at 281, 287.) Her shoulders hurt because she has arthritis in them. (Id. at 281.) She has neuropathy in her feet; this makes her feet feel like she is constantly standing on hot rocks. (Id.) And, they are tingling and numb. (Id.) She takes medication for high-blood pressure. (Id.) She is very nervous and is depressed. (Id.) She is in constant pain because of the neuropathy, which developed in 2004, and the arthritis. (Id. at 282.) If she stands for as little as ten minutes, her feet start hurting. (Id.) She sees a foot specialist, Sharon Anderson, for the problem. (Id. at 282-83.) She has been told that the arthritis in her shoulders and lower back caused the neuropathy. (Id. at 283.)

She has had a problem with depression for quite a few years, probably since grade school. (Id. at 284-85.) Dr. Brewer first diagnosed it, and she is now being treated for it by Dr. Cunningham. (Id. at 285.) She was taking Zoloft for the depression; she now takes Prozac. (Id.) She has been taking medication for depression since October 2004. (Id. at 292.) She takes Ultram for pain. (Id. at 285.) It is ineffective. (Id.) She also takes blood pressure medication. (Id.)

In July 2006, Plaintiff was hospitalized for a possible heart attack. (Id. at 286.) Her electricity had been turned off, it was hot, she had chest pains, and could not breathe. (Id. at 290.) The problem turned out to be anxiety. (Id. at 286.)

Plaintiff's social activities consist of going to church on Sunday morning, Sunday night, and Wednesday morning. (Id. at 287.) The church sends a bus for her. (Id.) She had to sell

her car because she could not afford the upkeep and needed the money from the sale to pay bills.  (Id. at 288.)

Plaintiff is unable to do any household chores.  (Id.)  Indeed, she has dishes in her sink that have not been washed in months.  (Id.)  Someone takes her grocery shopping.  (Id.)  She reads when at home.  (Id. at 288-89.)  She has no television and no telephone.  (Id. at 289.)  On an average day, she will lie down or rest in a recliner for approximately eight of the hours she is up.  (Id. at 291-92.)  Her depression causes crying spells.  (Id. at 292.)  Each lasts a couple of hours, and occurs approximately three times a week.  (Id. at 293.)  If her back is painful, it disturbs her sleep.  (Id.)  She sleeps a lot when she is on vacation.  (Id.)  If she is under stress, she speaks quickly.  (Id. at 294.)  She then has to stop talking and start again.  (Id.)

She has not seen Dr. Cunningham since July and needs to make another appointment.  (Id. at 295.)

Dr. Magrowski was next to testify.  The ALJ asked:

> If I were to find that [Plaintiff's] restricted to sedentary work, are there jobs that could be done by somebody her age, education, past work background that she, minimally that she has had, and by sedentary I mean work where she could not lift over, anything over ten pounds.  Would have to be seated the better part of the day, if not the whole workday.  Might be able to get up intermittently for short periods of time.  Standing and walking but no more than two hours a day.  If those were the only limitations I were to find are there jobs that could be done by somebody her age, education, with the work with the minimal work background she's had?

(Id. at 296.)  Dr. Magrowski thought that such a person could perform unskilled sedentary jobs such as taking orders over the telephone for food and beverage, i.e., an order clerk, some

unskilled clerical work that required sorting, addressing, and marking "clerical type products" when seated, and some simple assembly jobs.  (<u>Id.</u> at 296-97.)  There were at least 1,000 of each of these types of jobs in the state economy and 50,000 in the national economy.  (<u>Id.</u>)

If this hypothetical person also had difficulty focusing on matters or had medication side effects such as drowsiness, there were no sedentary jobs that she could perform.  (<u>Id.</u> at 297.)  And, if this person also had to lie down or sit in a recliner for at least eight out of twelve hours, there was no full-time work she could perform.  (<u>Id.</u> at 297-98.)  Nor could she maintain a regular work schedule if she had crying spells three times a week for two hours each.  (<u>Id.</u> at 298.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from various health care providers, and the report of a non-examining consultant.

When applying for SSI, Plaintiff completed a Disability Report form.  She listed her height as 5 foot 11 inches and her weight as 335 pounds.  (<u>Id.</u> at 73.)  Her impairments, i.e., problems with her right eye, nerves, and back, a hormone imbalance, and irregular periods, first bothered her in 1990 and prevented her from working as of June 30, 1984.  (<u>Id.</u> at 74.)  Asked if she had ever worked, she replied, "No."  (<u>Id.</u>)  The highest grade she had completed was tenth grade, in 1978.  (<u>Id.</u> at 78.)  She consulted Sharon Anderson, D.P.M., for her feet problems; Kevin W. Brewer, D.O., for her blood pressure and heart problems; and Michelle Gray, D.C., for her hip and back problems.  (<u>Id.</u> at 76.)

On a Function Report, Plaintiff explained that she did as little as possible during the day to avoid her feet feeling like they were on fire and her hip and back becoming unbearably painful. (<u>Id.</u> at 121.) She could no longer walk her dog, but simply let her out and gave her food and water. (<u>Id.</u> at 122.) She did not need any reminders to take care of her personal grooming or to take her medicine. (<u>Id.</u> at 123.) She prepared her own microwaved meals. (<u>Id.</u>) She did no household chores because of the problems with her feet, back, and hip. (<u>Id.</u> at 123-24.) She went outside four times a day and shopped for groceries once or twice a week. (<u>Id.</u> at 124.) Her only hobby was reading. (<u>Id.</u> at 125.) Her social activities included going to church and to McDonald's to visit with friends. (<u>Id.</u>) Her impairments affected her ability to lift, squat, bend, stand, walk, kneel, climb stairs, remember, complete tasks, and follow instructions. (<u>Id.</u> at 126.) She did not know how far she could walk before needing to rest, but she did know that she had to rest for one hour before walking again. (<u>Id.</u>) She followed written instructions very well; she did not follow spoken instructions well. (<u>Id.</u>) She got along well with authority figures. (<u>Id.</u> at 127.)

On a form for work background, Plaintiff listed two jobs as a dishwasher that each lasted for only one day. (<u>Id.</u> at 72.) One was in September 2004; the other was in May 2005. (<u>Id.</u>) From November to December 2004, she worked as baker and cashier. (<u>Id.</u>)

Plaintiff's cousin, Wanda Guinn, completed a Function Report in her behalf. (<u>Id.</u> at 112-20.) She had known Plaintiff for thirty-eight years and had seen her for one to two days every one to two months. (<u>Id.</u> at 112.) Asked to describe what Plaintiff did during the day, she reported that Plaintiff attempted to fix something to eat, let the dog out two or three times

and fed her, and frequently napped and rested.  (Id. at 112-13.)  Plaintiff had trouble bending to put on her shoes and socks, used a stool in the shower, and had to use the sink counter to pull herself up from the toilet.  (Id. at 113.)  Because of her depression, Plaintiff needed to be told to shower and wash her hair.  (Id. at 114.)  When she was able to afford medication, she needed to be reminded to take it.  (Id.)  She could prepare simple meals once or twice a day.  (Id.)  She could not stand long enough to cook a meal.  (Id.)  Her family and friends did her yard work and house cleaning.  (Id.)  Her pain prevented her from doing either.  (Id. at 115.)  It would take her all day to do a load of laundry.  (Id. at 114.)  She used to be able to play with the dog, go for a walk, clean her house, and do yard work, but she could no longer because of her impairments.  (Id. at 116.)  She left the house once or twice a week to visit with family and friends.  (Id. at 115.)  She drove, but should not be out alone.  (Id.)  When shopping, she would use an electric chair.  (Id.)  When she paid bills and handled money, someone needed to check her arithmetic and spelling.  (Id.)  Her hobbies included watching television and reading.  (Id. at 116.)  Because of her depression, she no longer wanted to be around people.  (Id. at 117.)  Her impairments affected Plaintiff's ability to lift, sit, climb stairs, understand, squat, kneel, bend, stand, follow instructions without being reminded, reach, see, complete tasks, get along with others, walk, remember, and concentrate.  (Id.)  She could not walk farther than ten to twenty feet without resting for ten to twenty minutes.  (Id.)  With assistance, she could follow written instructions.  (Id.)  With reminders or repetition, she could follow spoken instructions.  (Id.)  She had been in special education classes at school.  (Id.)  Plaintiff did not handle stress or changes in her routine well.  (Id. at 118.)  Because of

her depression, she had crying spells, was short of breath, withdrew from people, and slept more often.  (Id.)  She had worn glasses since she was a child.  (Id.)  Ms. Guinn explained that Plaintiff's parents had provided her everything she needed, e.g., they provided the food, paid the bills, cleaned the house, and took her to the store or doctor, but they were both deceased. (Id. at 119.)  Plaintiff's depression, high blood pressure, learning disabilities, neuropathy in her feet, occasional hip displacement, and vision problems in her right eye prevented her from living a normal life.  (Id.)

On an undated medication form, Plaintiff listed gabapentin (a generic form of Neurontin) for nerves in her feet, tramadol for pain in her back, lisinpril and clonidine for blood pressure, hydrochlorothiazide, and fluoxetine for depression.  (Id. at 71.)

After the initial denial of her application, Plaintiff completed a Disability Report – Appeal form.  (Id. at 106-11.)  She reported that her condition had worsened on July 8, 2005, and she could no longer stand for even ten minutes without extreme back and feet pain.  (Id. at 106.)  Also, since November 4, 2004, she suffered from depression.  (Id. at 107.)

In a report of contact dated October 6, 2005, L. Smith, an employee of the Missouri State Section of Disability Determinations, reported that Plaintiff explained that she liked the job at the bakery and did it well; however, the job ended after two months because the bakery closed.  (Id. at 130.)  The worker described Plaintiff as being very upbeat and cheerful during their telephone conversation.  (Id.)

In November 2005, Plaintiff was granted Medicaid benefits after she successfully appealed an initial denial.  (Id. at 57-60.)   It was determined that she suffered from

depression, hypertension, obesity, peripheral neuropathy, chest pain, and pain and numbness in her feet.  (Id. at 58.)  These conditions were severe and prevented her from either returning to her past relevant work or from engaging in other employment, given her limited education, age, lack of training, and lack of work experience.  (Id.)

The medical records before the ALJ are summarized in chronological order below.

Plaintiff consulted Christopher Johnson, D.P.M., on January 15, 2002, about painful toenails, discomfort in the outer edges of her feet, and a burning sensation or numbness in her toes.  (Id. at 181-82.)  She stated that 60% of her waking hours were spent on her feet.  (Id. at 181.)  On examination, she had pain on direct palpation to her toes, in addition to burning sensations in her feet and toes.  (Id.)  Her toenails were thickened, incurvated, and discolored with subungal (beneath the nail) debris.  (Id.)  She had four hammertoes on each foot.  (Id.)  The impression was of onychomycosis (a fungal infection in her toenails) and inflamed keratoma, or calluses.  (Id.)  After debriding the hyperkeratotic-tissue lesions and filing a toenail on her left foot, Dr. Johnson recommended that Plaintiff wear a good, supportive shoe, use toe crest pads, and consider custom made or over-the-counter inserts for her shoes.  (Id. at 182.)

Plaintiff consulted Sharon Anderson, D.P.M., on January 30.  (Id. at 183-84.)  She described the pain and numbness in her feet as being better.  (Id. at 183.)  She was wearing the toe crest pads daily and was to continue doing so.  (Id. at 183, 184.)

Plaintiff reported to Dr. Anderson on April 1 that the sides of her feet felt numb.  (Id. at 180, 185.)

Plaintiff saw Dr. Anderson again on March 17, 2003, and was again reminded to file her toenails. (Id. at 178-79.)

When Plaintiff complained to Dr. Anderson on September 22 of three ingrown toenails on her left foot, she was advised to soak in Epsom salt and water twice a day. (Id. at 176-77.) Dr. Shukla was listed as her primary care physician. (Id. at 177.)

On January 23, 2004, Plaintiff complained to Dr. Anderson of numbness in the balls of both feet. (Id. at 174-75.) She was given 1/8 inch felt pads for her shoes, to be used as needed, and was reminded to file her toenails. (Id. at 174.) Pressure specified sensory device testing was to be arranged. (Id.)

Following that neurosensory testing six days later, Dr. Anderson requested that Kevin Brewer, D.O., evaluate Plaintiff for "possible medical conditions causing neuropathy . . . ." (Id. at 168-69.) In her letter to Dr. Brewer, Dr. Anderson described the results of the test as being consistent with bilateral sensory polyneuropathy with axonal loss and with severe diabetic neuropathy. (Id. at 168.) Because she was not a known diabetic, a work up for the etiology of the neuropathy was warranted. (Id.) Based on the test and on clinical results, Dr. Anderson opined that Plaintiff was a candidate for surgical release of entrapped nerves, which could result in a 80-90% chance of restoration of sensation in her feet. (Id. at 169.)

Plaintiff saw Dr. Brewer for the first time on February 6. (Id. at 207-08.) She was described as pleasant and "with no real specific complaints." (Id. at 207.) She had no chest pain, no shortness of breath, and no orthopnea (discomfort when lying flat). (Id.) Plaintiff reported that her blood pressure had been running "a little bit high" for about five years. (Id.)

Her blood pressure reading was 184/136.  (Id.)  She had no chest pain, visual changes, or headaches.  (Id.)  The diagnosis was obesity and hypertension.  (Id.)  She was prescribed Lopressor (lisinopril) for her blood pressure and was counseled about losing weight and restricting her salt intake.  (Id. at 208.)

On February 4, Plaintiff saw Dr. Anderson for left heel pain.  (Id. at 172-73.)  The pads in her shoes seemed to help.  (Id. at 172.)  She weighed 350 pounds.  (Id.)  She was prescribed B6 and B12 vitamins to be taken twice daily.  (Id. at 173.)

When Dr. Brewer saw Plaintiff on February 20, he decided to add hydrochlorothiazide, another blood pressure medication, to her regimen.  (Id. at 206.)  Plaintiff weighed 340 pounds. (Id.)  Her deep tendon reflexes were normal; her Babinski's sign was negative.[3]  (Id.) Her blood pressure was 160/110.  (Id.)

When Plaintiff next consulted Dr. Brewer about her hypertension, on March 8, he noted that, although her blood pressure was down, the hypertension persisted.  (Id. at 205.) Her blood pressure was 138/96.  (Id.)  He thought an increase in her medication might be necessary, but wanted to wait for a month to determine if it really was.  (Id.)

At her March 22 visit, Dr. Anderson noted that Plaintiff had painful, fungal nails.  (Id. at 169-70.)  The nerves in her feet were calmed by the vitamins she was taking, and the numbness had diminished.  (Id. at 170.)  Her weight was not noted.  (Id.)

---

[3]A Babinski sign, the upturning of the big toe and fanning of the other toes on stimulation of the outside of the sole, in an adult is indicative of a problem in the central nervous system. MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=7186 (last visited Feb. 19, 2009).

Plaintiff reported to Dr. Anderson on April 5 that she had more feeling in her feet since taking Foltx, a multivitamin with folic acid. (Id. at 166-67.) It was noted that a Tinel's sign was still present, but it was not as intense as before. (Id. at 167.) She was prescribed Neurontin, see page 8, supra. (Id. at 166.)

On April 7, Plaintiff reported to Dr. Brewer that she had no new complaints and felt "reasonably well." (Id. at 204.) Her blood pressure was 144/84. (Id.) She complained, however, of being tired all the time and yawned throughout the visit. (Id.) She reported that she did not have a lot or problems with insomnia, but did have some problems going to sleep at night and occasionally took Tylenol PM. (Id.) Dr. Brewer noted that she had a lot of symptoms consistent with sleep apnea and that she weighed 350 pounds. (Id.) He described her as having a Pickwickian appearance.[4] (Id.) Her Babinski's sign was negative. (Id.)

Two weeks later, on April 21, Dr. Anderson noted that Plaintiff had a large calcium spur on her left heel. (Id. at 163-65.) The recommended cushioned pads for her shoes felt great. (Id. at 164.) The same day, Plaintiff consulted Dr. Brewer about a productive cough and shortness of breath for the past four to five days. (Id. at 203.) During the consultation, Plaintiff nodded off and yawned. (Id.) Sleep studies were set up; Dr. Brewer thought she might have sleep apnea. (Id.) Her blood pressure was 138/78. (Id.)

---

[4]Pickwickian syndrome is "a combination of severe, grotesque obesity, somnolence, and general debility, theoretically resulting from hypoventilation caused by the obesity . . . ." mediLexicon, http://www.medilexicon.com/medicaldictionary.php (last visited Feb. 19, 2009).

Plaintiff was reminded on May 24 to file her toenails. (Id. at 161-62.) The cushioned pads in her shoes would slide back. (Id. at 162.) Her left heel was painful, particularly in the morning. (Id.) Her toenails were painful and had a fungus. (Id.)

When Plaintiff saw Dr. Anderson on June 7 she described the pain in her left heel as seven out of ten. (Id. at 159-60.) She had a burning sensation on the outside edge of her right foot and her toes felt like someone was squeezing them. (Id. at 160.) She was to take Motrin, do stretching exercises, and wear cushioned support pads in her shoes. (Id. at 159.)

On July 14, Plaintiff informed Dr. Brewer that she was sleepy during the daytime and was tired all the time. (Id. at 199.) She did not think she could afford to have a sleep study done. (Id.) Her vital signs were stable. (Id.) She weighed 354 pounds. (Id.)

Plaintiff reported to Dr. Anderson on August 30 that her left heel was painful in the morning if she did not stretch before going to bed. (Id. at 157-58.)

Dr. Brewer noted on September 27 that Plaintiff had not taken her blood pressure medication in three days. (Id. at 201.) Her blood pressure was 178/110. (Id.) The same day, he completed a physical examination form for her for employment in the kitchen at the Salem Care Center. (Id. at 202.) He answered "yes" to the question whether she was physically and mentally fit to work in a nursing home. (Id.)

Plaintiff had no specific or new complaints when she saw Dr. Brewer on October 25. (Id. at 198.) Her blood pressure, 160/90, was elevated due to her not taking her medication the day before. (Id.) The diagnosis was hypertension, obesity, and sleep apnea. (Id.) Dr. Brewer and Plaintiff discussed sleep studies. (Id.) Plaintiff agreed to think about it. (Id.)

Plaintiff had no new complaints when she saw Dr. Brewer on January 12, 2005. (Id. at 197.) She had forgotten that day to take her blood pressure medication; consequently, it was a little high at 168/86. (Id.) Dr. Brewer recommended she have a mammogram and discussed again her undergoing a sleep study. (Id.) He speculated that the latter was a financial problem. (Id.) Her hypertension was described as being fairly well controlled. (Id.)

On February 1, Plaintiff reported to Dr. Anderson that the pain in her left ankle had gone. (Id. at 155-56.) Her condition was otherwise static. (Id. at 155.)

Michelle Gray, D.C., saw Plaintiff on March 1, 2005, and May 11, 2005. (Id. at 134.) Her notes of those visits are illegible. (Id.)

Plaintiff's only new problem when she next saw Dr. Brewer, on April 8, was depression caused by her mother's death. (Id. at 196.)

Plaintiff had no new complaints and felt "reasonably well" when she next saw Dr. Brewer, on April 22. (Id. at 195.) Her blood pressure was 154/98. (Id.) Her problems were hypertension, not well controlled, obesity, and depression. (Id.) Her depression was described as being improved with the Zoloft. (Id.) Zestril (lisinopril) was prescribed for her hypertension. (Id.) She was counseled on diet and weight loss. (Id.) She then weighed more than 350 pounds. (Id.)

At her May 2 visit to Dr. Anderson, Plaintiff's toe nails were debrided. (Id. at 153-54.) It was noted that her nail care placed her at risk for paronychia, an inflammation of the nail fold surrounding the nail plate. (Id. at 154.) She was reminded to file her nails. (Id. at 153.)

Plaintiff reported to Dr. Brewer on May 20 that she felt "reasonably well." (Id. at 194.) Her dosage of Zestril was increased. (Id.) Her blood pressure was 156/90. (Id.)

Plaintiff went to the Phelps County Regional Medical Center on June 8 with complaints of pressure and tightness in her chest and risk factors for coronary artery disease. (Id. at 136-47.) She had had no previous heart-related problems. (Id. at 137.) She also had no weakness or difficulty walking. (Id.) An electrocardiogram showed a sinus rhythm with minimal voltage criteria for left ventricular hypertrophy. (Id. at 138, 144.) The admission diagnosis was hypertension and chest pain with features of angina.[5] (Id. at 138.) A persantine nuclear myocardial stress test was performed the same day to evaluate the function, performance, and capacity of Plaintiff's heart and blood vessels. (Id. at 140-43.) With the exception of a 66% left ventricular ejection fraction indicative of minimal septal hypokinesis (diminished or slow movement), it was a normal study. (Id. at 141.) A chest x-ray revealed no active intrathoracic disease. (Id. at 145.) An echocardiogram revealed concentric hypertrophy of Plaintiff's left ventricle with normal systolic function, Stage I diastolic dysfunction of the left ventricle, and mild mitral and tricuspid regurgitation. (Id. at 146-47.)

When Plaintiff again consulted Dr. Brewer on June 20 about her hypertension, she reported that she had been missing some doses of her medication due to her lack of money. (Id. at 193.) Her blood pressure waas 172/96. (Id.) Dr. Brewer stressed that the clonidine

_____

[5]In her brief in support of her complaint, Plaintiff erroneously refers to this diagnosis as a discharge diagnosis. It is a diagnosis on admission only. (See id. at 138, 139.)

could not be abruptly stopped.  (Id.)  Plaintiff was given samples of Flonase and Zoloft and was to return in two to three months.  (Id.)  She weighed more than 350 pounds.  (Id.)

Plaintiff returned in three weeks.  On July 13, Plaintiff spoke to Dr. Brewer about her dissatisfaction with the medical system, including a $7,000 hospital bill, her lack of approval for Medicare, and the adverse disability determination.  (Id. at 191.)  She also complained of worsening vertigo, increasing dizziness, and heavy menstrual periods.  (Id. at 191, 192.)  Her blood pressure was 130/72.  (Id. at 191.)  Dr. Brewer increased her dosage of Zoloft, gave her samples of Allegra, and prescribed Antivert.  (Id. at 192.)  He described her depression as "worsening."  (Id.)  She wanted a prescription for birth control pills.  (Id.)  Dr. Brewer declined on the grounds of her age, obesity, and hypertension.  (Id.)  He recommended that she see a gynecologist.  (Id.)

Plaintiff's condition was again described by Dr. Anderson as static on July 20.  (Id. at 150-52.)  Her dosage of Elavil was increased, and she was encouraged to lose 100 pounds, go on a diabetic diet, and consult a dietician.  (Id. at 151.)  Her weight was 350 pounds.  (Id. at 152.)

Plaintiff returned to Dr. Brewer on August 23.  (Id. at 190.)  In addition to burning and painful feet, she complained of pain in her knees and mid-back.  (Id.)  The pain made it difficult for her to walk, stand, or sit.  (Id.)  Dr. Brewer noted that Plaintiff was morbidly obese and hypertensive.  (Id.)  She was not taking her medication.  (Id.)  Her blood pressure was 180/120.  (Id.)  She appeared to have some arthritic changes in her knees and her upper back was tender throughout the mid-thoracic spine.  (Id.)  She weighed 342 pounds.  (Id.)

Plaintiff first saw Charles W. Cunningham, D.O., on December 19, reporting that she had been out of medication for three months because of lack of money. (Id. at 216.) She did not know the names of the medication. (Id.) Her blood pressure was 202/130. (Id.) She also reported that she had headaches, dizziness, and blurred vision.[6] (Id.) The diagnosis was hypertension. (Id.)

Complaining of continuing dizziness and plugged ears, Plaintiff saw Dr. Cunningham again ten days later. (Id. at 215.) He noted that she had been prescribed medication on December 19, but had not started taking it until three days later. (Id.) Her blood pressure was 122/80. (Id.) He queried whether she could afford the medication and diagnosed her with bilateral otitis media. (Id.)

Plaintiff's prescriptions for Prozac, lisinopril, clonidine, Allegra, and Flonase were renewed when she saw Dr. Cunningham again on April 6, 2006. (Id. at 214.) The diagnosis was peripheral neuropathy. (Id.) The next day she reported that she also needed a refill for Neurotin (gabapentin). (Id. at 213.) She had pain and a decreased range of motion in her left shoulder. (Id.) She was diagnosed with bursitis. (Id.)

Plaintiff told Dr. Cunningham on May 9 that she had back pain made worse by standing. (Id. at 211.) She explained that she had fallen off a horse twenty years before and had had problems ever since. (Id.) Her weight was 308.6 pounds. (Id.) Her blood pressure was 150/92. (Id.) She was to have an x-ray of her thoracic and lumbar spine. (Id. at 211, 253.) That x-ray revealed chronic disc degeneration at L4-L5 and L5-S1, degenerative

---

[6]There is another complaint listed; however, it is illegible.

changes at facet joints in her lower lumbar spine and lumbosacral junction, and mild degenerative changes at L3-L4. (Id. at 252.) There were no other significant findings. (Id.)

When Plaintiff saw Dr. Cunningham on June 15 she reported that the Ultram was not helping; she wanted a different pain medication. (Id. at 210.) It was noted that she had a decreased range of motion in her back. (Id.) Dr. Cunningham prescribed Vicodin. (Id.)

After being without electricity for six to seven days, Plaintiff called 911 on July 3 with complaints of shortness of breath. (Id. at 219, 221.) When the ambulance crew arrived at her house, she did not appear to be short of breath, but was pale, warm, and diaphoretic (perspiring). (Id. at 219, 243.) She walked with assistance to the ambulance, was placed on a heart monitor, and was taken to Salem Memorial District Hospital. (Id.) The monitor revealed sinus tachycardia. (Id. at 220.) Her blood pressure was 101/61. (Id.) Plaintiff reported that she had not eaten for several days, with the exception of a breakfast bar and chips. (Id.) She was admitted to the hospital and underwent a chest x-ray, which revealed no evidence of acute cardiopulmonary disease. (Id. at 222, 225, 235.) After Plaintiff expressed a preference to be treated by Dr. John Hess, she was transferred on July 4 to Missouri Baptist Hospital. (Id. at 230, 232, 248, 251, 258.) The admission notes from that hospital report that Plaintiff had a history of hypertension and diabetes. (Id. at 258.) It was also noted that Plaintiff was transferred there for a definitive evaluation of her heart because of her cardiovascular risk factors and strong family history of heart problems. (Id.) Plaintiff was discharged on July 6 with instructions not lift anything heavier than ten pounds for a

week and to her limit her stair climbing.  (<u>Id.</u> at 256.)  She had no limitations on walking or working.  (<u>Id.</u>)  She had no pain.  (<u>Id.</u>)

In addition to Plaintiff's medical records, the ALJ had before him two assessments performed pursuant to Plaintiff's application.

L. Smith completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff in October 2005.[7]  (<u>Id.</u> at 84-91.)  Bilateral foot pain was listed for the primary diagnosis; hypertension was listed for the secondary diagnosis; nerves, hormone imbalance, and back pain were listed as other impairments.  (<u>Id.</u> at 84.)  These impairments resulted in exertional limitations of being able to occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for at least two hours in an eight-hour work, and sit for about six hours in an eight-hour workday.  (<u>Id.</u> at 85.)  Plaintiff was unlimited in her ability to push or pull.  (<u>Id.</u>)  She had no postural, manipulative, or communicative limitations.  (<u>Id.</u> at 88-90.)  She had visual limitations in her depth perception, accommodation, and field of vision in her right eye.  (<u>Id.</u> at 89.)  She had one environmental limitation, i.e., she needed to avoid concentrated exposure to hazards, such as machinery and heights.  (<u>Id.</u> at 90.)

The same month, Stanley P. Hutson, Ph.D., completed a Psychiatric Review Technique form ("PRTF") for Plaintiff.  (<u>Id.</u> at 92-105.)  Dr. Hutson concluded that Plaintiff had an affective disorder, but it was not severe.  (<u>Id.</u> at 92, 95.)  Her disorder did not result in any

---

[7]The pages with a summary of Plaintiff's medical records are out of order.  The summary starts on page 85, continues on page 88, and ends on page 87.

difficulties in maintaining social functioning, concentration, persistence, or pace, in any restriction of activities of daily living, or in any episodes of decompensation.  (<u>Id.</u> at 102.)

**<u>The ALJ's Decision</u>**

The ALJ first noted that, although Plaintiff had alleged a disability onset date of June 1984, it was unnecessary to determine whether she was disabled prior to the filing date of her SSI application in August 2005.

Following the sequential evaluation process, described below, the ALJ first found that Plaintiff had never engaged in substantial gainful activity.  (<u>Id.</u> at 11.)

After reviewing the medical records, the ALJ next determined that Plaintiff had impairments of obesity, peripheral neuropathy of the feet, and degenerative disc disease of the lumbar spine.  (<u>Id.</u> at 11-12.)  These impairments, in combination, caused significant limitations in her ability to perform work-related activities and were severe as defined in the Act.  (<u>Id.</u> at 12.)  The ALJ found at step three that these impairments did not, however, meet or medically equal in severity or duration an impairment of listing-level severity.  (<u>Id.</u>)

In addressing the fourth step of the process, whether Plaintiff could perform past relevant work, the ALJ assessed her residual functional capacity ("RFC").  (<u>Id.</u> at 13-14.) This assessment required an evaluation of Plaintiff's allegations about her symptoms.  (<u>Id.</u> at 13.)  The ALJ found that, although Plaintiff did have limitations caused by her impairments, her allegations of symptoms that would preclude all work were not persuasive because of inconsistencies in the record.  (<u>Id.</u>)  For instance, Plaintiff had failed to follow Dr. Anderson's recommendations of further evaluation and possible surgery to restore full functioning in her

feet.  (Id.)  Indeed, "even with only minimal additional treatment, [Plaintiff] would not be precluded from working by any symptoms associated with neuropathy."  (Id.)  Also, Dr. Brewer's observations that Plaintiff's generally felt "fairly well" were not suggestive of someone who was unable to work.  (Id.)  Surgery had never been recommended for Plaintiff's back problem and only Vicodin, prescribed for the relief of mild to moderate pain, had been prescribed.  (Id.)  On her discharge from the hospital in July 2006, she was described as having no pain and was subject to only mild restrictions.  (Id. at 13-14.)  There was no medical evidence confirming that Plaintiff had any problems with her right eye.  (Id. at 14.)  She had not pursued Dr. Brewer's recommendation that she undergo further testing for sleep apnea, although she had been approved for Medicaid in November 2005.  (Id.)  There was no diagnosis of a hormone imbalance or irregular periods, nor was there any medical treatment for either.  (Id.)  Plaintiff's hypertension was controlled by medication and there was no end organ damage.  (Id.)  Cardiac testing was normal.  (Id.)

The ALJ noted that Plaintiff testified at the hearing that she had work-related limitations caused by depression.  (Id.)  He further noted that she had not alleged such in her application, nor had she had any ongoing treatment for a mental health problem.  (Id.)  Dr. Cunningham's notes did not reflect a prescription for Prozac or any other psychotropic medication.[8]  (Id.)  Her activities suggested that depression was not a problem.  (Id.)

---

[8]This finding is in error.  Prozac is listed in Dr. Cunningham's records of April 2006 as a current medication for Plaintiff.

After assessing Plaintiff's credibility and reviewing the record, the ALJ determined that Plaintiff retained the RFC "to perform work involving primarily sitting, with only occasional standing and walking for no more than two hours in an 8-hour workday. Additionally, [Plaintiff] would be limited to lifting no more than ten pounds." (Id. at 15.)

Because Plaintiff had no past relevant work, the burden shifted to the Commissioner to identify jobs existing in the national economy that Plaintiff was capable of performing with her RFC. (Id. at 15.) Considering her age, education, work experience and a RFC for the full range of sedentary work,[9] application of the medical-vocational guidelines ("the Grid") directed a finding that she was not disabled. (Id.)

## Additional Records Before the Appeals Council

After the ALJ rendered his adverse decision, Plaintiff submitted to the Appeals Council her school records from grades three through ten. (Id. at 268-72.) It was noted in those records that both her parents had completed one year of high school. (Id. at 269.) Plaintiff's grades were primarily "Ds" and "Fs." (Id. at 268, 270.) When Plaintiff was nine years old, her intelligence quotient ("IQ") was 97; when she was eleven, it was 77; and when she was thirteen it was 79. (Id. at 270-71.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or

---

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing." 20 C.F.R. § 404.1567(a).

mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 416.920(a)(4); **Delph v. Astrue**, 538 F.3d 940, 946 (8th Cir. 2008); **Hepp v. Astrue**, 511 F.3d 798, 803 (8th Cir. 2008). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). Second, the claimant must have a severe impairment. 20 C.F.R. § 416.920(a)(4)(ii). A "severe impairment" is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." **Gonzales v. Barnhart**, 465 F.3d 890, 894 (8th Cir. 2006). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(a)(4)(iii), and Part 404, Subpart P, Appendix 1. If the claimant

meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

If the claimant does not satisfy the requirements of step three, the ALJ address the fourth step.  At this step, the ALJ must determine whether the claimant has the RFC to return to her past relevant work.  20 C.F.R. § 416.920(a)(4)(iv).  "Past relevant work" is "work that [the claimant] [has] done within the last 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it."  20 C.F.R. § 416.920(b)(2).  An RFC assessment is "the degree to which the claimant is able to perform work-related activities despite the limitations caused by his or her impairments and any related symptoms, such as pain."  **Willcockson v. Astrue**, 540 F.3d 878, 879 (8th Cir. 2008).  "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"  **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  **Cox v. Astrue**, 495 F.3d 614, 619 (8th Cir. 2007).  "Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively."  **Id.**; accord **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000).  "'[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581

(8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alteration in original).

Additionally, in determining a claimant's RFC, "'the ALJ must evaluate the claimant's credibility.'"  **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001)).  This evaluation requires that the ALJ consider "[1] a claimant's daily activities; [2] the duration, frequency, and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness, and side effects of medication; and [5] functional restrictions."  **Id.** (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  And, "'[s]ubjective complaints may be discounted if there are inconsistencies in the evidence as a whole.'"  **Id.** (quoting <u>Polaski</u>, 739 F.2d at 1322).  After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005); **Pearsall**, 274 F.3d at 1217.  The Commissioner may meet his burden by eliciting testimony by a VE, **id.** at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for

people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006). See also **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (noting that the Guidelines may be employed if the nonexertional impairment does not diminish or significantly limit the claimant's RFC); Social Security Ruling 83-47C, 1983 W.L. 31276, *3 (S.S.A. 1983) ("[I]f the nonexertional limitation restricts a claimant's performance of a full range of work at the appropriate [RFC] level, nonexertional limitations must be taken into account and a nonguideline determination made.").

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Steed v. Astrue**, 524 F.3d 872, 875 n.3 (8th Cir. 2008); **Blakeman v. Astrue**, 509 F.3d 878, 881 (8th Cir. 2007); **Cox**, 495 F.3d at 617. The Commissioner may meet his burden by eliciting testimony by a VE. **Pearsall**, 274 F.3d at 1219. If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is to be affirmed "if it is 'supported by substantial evidence on the record as a whole.'" **Goff**

**v. Barnhart**, 421 F.3d 785, 789 (8th Cir. 2005) (quoting <u>Tellez v. Barnhart</u>, 403 F.3d 953, 956 (8th Cir. 2005)).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (internal quotations omitted); **Finch v. Astrue**, 547 F.3d 933, 935 (8th Cir. 2008).  The ALJ's denial of benefits is not to be reversed "'so long as the ALJ's decision falls within the available zone of choice.'" **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (quoting <u>Bradley v. Astrue</u>, 528 F.3d 1113, 1115 (8th Cir. 2008)).  That the Court may have reached a different decision if it had been the initial finder of fact or that there were two possible and inconsistent positions from the evidence, one of which supports the ALJ's findings, does not remove the ALJ's decision from "the zone of choice." **Id.**; <u>accord</u> **Goff**, 421 F.3d at 789; **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000).

### Discussion

Plaintiff argues that the ALJ's adverse decision is not supported by substantial evidence on the record because his conclusions about her RFC did not include the evidence of her borderline intellectual functioning that was submitted to the Appeals Council.  The Commissioner disagrees.

Title 20 C.F.R. § 416.1476(b) provides that "[i]n reviewing decisions based on an application for benefits, the Appeals Council will consider the evidence in the [ALJ] hearing record and any new and material evidence only if it relates to the period on or before the date of the [ALJ] hearing decision."  "To be 'new,' evidence must be more than merely cumulative

of other evidence in the record." **Bergmann v. Apfel**, 207 F.3d 1065, 1069 (8th Cir. 2000).[10]

"To be 'material,' the evidence must be relevant to the claimant's condition for the time period for which benefits were denied." **Id.** "Where . . . the Appeals Council considers new evidence but denies review, [the Court] must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." **Davidson v. Astrue**, 501 F.3d 987, 990 (8th Cir. 2007).

The list of exhibits before the Appeals Council consists of Plaintiff's counsel's memorandum in support of the request for review and her school records. (See R. at 2.) The notice denying the request does not refer to the new evidence.

The Appeals Council's decision at issue in **Lamp v. Astrue**, 531 F.3d 629 (8th Cir. 2008), noted that it had considered a dated exhibit as new evidence but did not specify whether that exhibit included an undated letter that was also submitted. **Id.** at 632. This undated letter included an explanation that the ALJ had requested. **Id.** at 633. The case was remanded to the district court with instructions to remand it to the Appeals Council because the court was "unable to discern whether the Appeals Council considered this new and material evidence." **Id.** And, in **Gartman v. Apfel**, 220 F.3d 918, 922 (8th Cir. 2000), a case was remanded to the district court with instructions to remand it to the Appeals Council when the Council's decision letter simply referred to "additional evidence" but did not specify

---

[10]The decision in **Bergmann** refers to the regulations governing disability income claims. However, as noted by the Eighth Circuit in **Willcockson**, 540 F.3d at 879, the regulations governing Plaintiff's SSI claim "are identical in all relevant respects" to the disability income claim regulations.

whether that additional evidence included a doctor's new and material evidence that had been submitted to the Council after the ALJ's adverse decision.

The evidence of Plaintiff's school records is clearly new. The question then is whether it is material. The Commissioner argues that it is not.

The Appeals Council had before it evidence of Plaintiff's IQ scores when she was nine, eleven, and thirteen years old. When she was nine, her intelligence quotient ("IQ") was 97; when she was eleven, it was 77; and when she was thirteen, it was 79. (R. at 270-71.) These last two scores place Plaintiff in the category of borderline intellectual functioning. <u>See</u> **Hutsell v. Massanari**, 259 F.3d 707, 709 n.3 (8th Cir. 2001) (noting that borderline intellectual functioning was defined as an IQ score within the 71-84 range and citing American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 39-40, 684 (4th ed. 1994)); <u>see also</u> **Dukes v. Barnhart**, 436 F.3d 923, 925 (8th Cir. 12006) (full scale IQ of 77 placed claimant in borderline intellectual functioning range); **Swope v. Barnhart**, 436 F.3d 1023, 1024 (8th Cir. 2006) (full scale IQ of 83 placed claimant in category of borderline intellectual functioning). "A diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence." **Nicola v. Astrue**, 480 F.3d 885, 887 (8th Cir. 2007) (reversing and remanding case in which ALJ found otherwise). Also, with such a diagnosis, a psychiatric review technique analysis must be conducted and documented at the ALJ and Appeals Council levels. **Id.** <u>See also</u> **Swope**, 436 F.3d at 1025 ("Time and again, [the Eighth Circuit] has concluded that borderline intellectual functioning, if supported by the record as it is here, is a significant

nonexertional impairment that must be considered by a vocational expert.") (internal quotations omitted). Dr. Hutson had only evidence of Plaintiff's depression before him; accordingly, he did not address her borderline intellectual functioning when completing his analysis. In addition to Plaintiff's IQ scores supporting the diagnosis, there is evidence of her receiving primarily "Ds" and "Fs" in school.

Although the Commissioner agrees that Plaintiff's IQ scores appear to place her in the borderline range of intellectual functioning, the Commissioner discounts the significance of that placement, noting that she worked as a cashier; that she could read, write, and count money; and that she went to church, shopped, and lived by herself.

There is no evidence of what percentage of her two months working at the bakery were spent as a cashier. There is her cousin's evidence that she was not able to handle money without someone checking her arithmetic. There is evidence that Plaintiff goes to church three times a week, getting rides each time. There is evidence that she reads as a hobby, but there is no evidence of what she reads, how much she retains, and how much she understands. There is also evidence that she lives alone and does not have a television or any other hobbies. This evidence, or lack thereof, does not depreciate the significance of her borderline intellectual functioning.

Because the evidence of Plaintiff's borderline intellectual functioning is both new and material and because it cannot be determined whether the Appeals Council considered this evidence, the case must be reversed and remanded to the ALJ for a determination of whether

Plaintiff has borderline intellectual functioning and, if so, consideration by a vocational expert of that functioning.

Accordingly, for the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have **up to and including March 9, 2009**, by which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. <u>See</u> **<u>Griffini v. Mitchell</u>**, 31 F.3d 690, 692 (8th Cir. 1994).


<u>/s/ Thomas C. Mummert, III</u>
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>25th</u> day of February, 2009.